AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
06/29/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___dj___ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
6/28/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___jb___ DEPUTY

United States of America,

v.

ROCC DENNIS COLLINS,

Defendant.

Case No. 2:21-mj-03057-DUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of May 23, 2021, in the county of San Luis Obispo in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Poss. w/Int. to Dist. Cont. Subs. |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

Sean Lusk
*Complainant's signature*

Sean Lusk, FBI TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 29, 2021

*(signature)*
*Judge's signature*

City and state: Santa Barbara, California

Hon. Louise A. Lamothe, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kevin B. Reidy, x8536

**AFFIDAVIT**

I, Sean D. Lusk, being duly sworn, declare and state as follows:

I. **PURPOSE OF AFFIDAVIT**

1. This affidavit is submitted in support of a criminal complaint and arrest warrant against Rocc Dennis COLLINS ("COLLINS") for a violation of 21 U.S.C § 841(a)(1) (possession with intent to distribute a controlled substance).

2. This affidavit is also made in support of applications for warrants to search the following:

   a. A maroon 2006 model year Ford F-150 pickup, bearing California License Plate number 33940B2, and Vehicle Identification Number ("VIN") 1FTPW14526KC30791, as described more fully in Attachment A-1 (the "SUBJECT VEHICLE");

   b. The person of COLLINS, as described more fully in Attachment A-2;

   c. The premises located at 5395 Traffic Way # B232, Atascadero, California 93422, as described more fully in Attachment A-3 (the "SUBJECT PREMISES"); and

   d. A black and gray Apple iPhone 12 with a cracked screen and or screen cover with a black case, seized on May 23, 2020, and currently in the custody of the FBI in Santa Maria, California, as described more fully in Attachment A-4 (the "SUBJECT DEVICE").

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute

controlled substance); 846 (conspiracy and attempt to distribute controlled substance); 18 U.S.C. §§ 922(g)(1) (felon in possession of ammunition); and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1, A-2, A-3, A-4 and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my review of the evidence seized during COLLINS's arrest, my training and experience, body camera footage from law enforcement, and information obtained from various law enforcement reports, law enforcement personnel, and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am currently a Task Force Officer ("TFO") with the FBI assigned to the Central Coast Safe Streets Task Force.  I am also employed as a full-time, sworn law enforcement officer for the California Highway Patrol and have been for the past 21 years.  I am currently assigned to the Coastal Division Investigative Services Unit.  While assigned to this unit, my

primary responsibility is to investigate and assist other officers and allied agencies with in-depth investigations involving criminal street gangs, weapons, and narcotics violations.  I attended and graduated from the California Highway Patrol Academy and hold Basic, Intermediate, and Advanced Certificates from California Peace Officer Standards and Training.  I have completed a 72-hour Drug Recognition Expert course certified by the International Association of Chiefs of Police.  I have completed over 80 hours of narcotics and criminal interdictions training relating to the transportation, concealment, trends, and sales of illegal narcotics and other criminal activities.  I have spoken on numerous occasions with other officers and experts in the field of narcotics interdiction regarding current trends on narcotic sales and trafficking.  As a TFO, I have participated in numerous investigations involving federal firearm and drug offenses and participated in the execution of numerous arrest and search warrants.  I have also participated in the interviews of defendants, informants, and witnesses who had personal knowledge of firearm and drug trafficking methods.

### III. SUMMARY OF PROBABLE CAUSE

6.   On May 23, 2021, around 8:03 pm, Paso Robles Police Department ("PRPD") Officer Hart received information from dispatch to be on the lookout for a possible driver under the influence in a maroon Ford F150 truck with license plate number 33940B2.  The report indicated that the truck was last seen near

an O'Reilly's Auto Parts store on 21st Street in Paso Robles. Officer Hart located the SUBJECT VEHICLE in the O'Reilly's Auto Parts parking lot (which was the same make, model, and had the same license plate number as the dispatch report), confirmed the license plate provided by dispatch, and conducted a traffic stop.

  7. Officer Hart contacted COLLINS, the driver and sole occupant of the SUBJECT VEHICLE. Officer Hart informed COLLINS that someone had reported that his truck was swerving and COLLINS admitted that he had swerved his truck because someone was following him too closely. While Officer Hart was speaking with COLLINS, he saw a clear pipe in the center console ash tray of the SUBJECT VEHICLE. Based on his training and experience, Officer Hart recognized the pipe as a device often utilized to smoke methamphetamine. The pipe appeared to be unused.

  8. While Officer Hart asked COLLINS to begin a series of Field Sobriety Tests ("FSTs"), PRPD Sergeant Leonard, using a flashlight to inspect the interior of the SUBJECT VEHICLE from the outside, saw a second methamphetamine pipe in a cupholder on the driver's side of the center console. This methamphetamine pipe appeared hazier than the other pipe in the ash tray, which led the officers to believe that pipe in the center console had been used. After performing his own visual inspection of the pipe from outside the SUBJECT VEHICLE, Officer Hart removed the pipe from within the center console of the SUBJECT VEHICLE. At that point, COLLINS fled the traffic stop on foot and hid in some bushes nearby until he was eventually apprehended.

9. PRPD officers then searched the SUBJECT VEHICLE. On the floor of the front passenger seat, officers found a backpack containing: (i) a clear plastic Tupperware container inside of which officers found what DEA laboratory testing later determined to be approximately 111 grams of pure methamphetamine; (ii) a Glock-style, semi-automatic 9mm pistol with unknown manufacturer and bearing no serial number (commonly referred to as a "ghost gun") loaded with 8 rounds of 9mm ammunition; and (iii) a digital scale. Officers also found inside the backpack a blue-and-white container containing what DEA laboratory testing later determined to be approximately 8.6 grams of fentanyl. Officer Hart also located the SUBJECT DEVICE on the driver's seat of the SUBJECT VEHICLE. A certified interstate nexus specialist examined the 9mm ammunition rounds and determined that they had been made outside of California. COLLINS has been convicted of at least one felony crime punishable by a term of imprisonment exceeding one year.

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my conversations with law enforcement officers, my review of reports written by other law enforcement officers, audio and video body camera recordings, and evidence seized from COLLINS's arrest, as well as my own knowledge, training, and experience, I am aware of the following information.

**A. PRPD Officer Hart Stops COLLINS, Driving Alone in the SUBJECT VEHICLE, and Finds a Methamphetamine Pipe**

11. On May 23, 2021, around 8:03 pm, PRPD Officer Hart received information from PRPD dispatch to be on the lookout for a possible DUI driver in a maroon Ford F150 truck, California license plate number 33940B2, near an O'Reilly Auto Parts Store on Spring Street in Paso Robles.[1]  Officer Hart drove in his patrol car to the area of 21st Street and Spring Street in Paso Robles near where he knew an O'Reilly's Auto Parts Store was located.  Upon arrival, Officer Hart saw the SUBJECT VEHICLE pulling into the O'Reilly's Auto Parts Store parking lot.  Officer Hart pulled his patrol vehicle behind the SUBEJCT VEHICLE and confirmed that the license plate of the SUBJECT VEHICLE matched the plate number provided by PRPD dispatch.  PRPD dispatch informed Officer Hart that COLLINS was the registered owner of the SUBEJCT VEHICLE and that the truck had an expired registration in violation of California Vehicle Code section 4000(a)(1).  After the SUBJECT VEHICLE entered the O'Reilly's Auto Parts Store parking lot, Officer Hart conducted a traffic stop.

12. Officer Hart contacted COLLINS, the driver and sole occupant of the SUBJECT VEHICLE.  Officer Hart noticed that COLLINS had red and watery eyes and that his speech was slow.

---

[1] PRPD dispatch relayed the information from a recorded 911 call describing the SUBJECT VEHICLE as swerving erratically, almost hitting a bunch of cars, and identifying the SUBJECT VEHICLE's license plate number.

13. Officer Hart informed COLLINS that the SUBEJCT VEHICLE had expired registration and that someone had reported that COLLINS was swerving. COLLINS admitted that he had been swerving because someone was tailgating him and, when COLLINS looked back at the tailgating vehicle, the movement of his head had caused him to swerve.

14. During his conversation with COLLINS, Officer Hart saw a clear glass pipe in the ash tray area of the center console within the SUBJECT VEHICLE. Based on his training and experience, Officer Hart recognized the pipe as a device often used to smoke methamphetamine. Officer Hart instructed COLLINS to exit the SUBJECT VEHICLE and COLLINS complied. After COLLINS exited, Officer Hart visually inspected the pipe from the outside of the SUBJECT VEHICLE by looking inside through the windows and noticed that the pipe appeared unused.

15. Officer Hart then directed COLLINS to the rear bumper of the SUBJECT VEHICLE and began conducting a series of FSTs to determine if he was under the influence. While COLLINS was completing the FSTs, PRPD Sergeant Leonard and PRPD Officer Carson walked around the exterior of the SUBJECT VEHICLE and shined their flashlights through the windows to examine the passenger compartment. PRPD Sergeant Leonard noticed what he believed, based on his training and experience, to be a second methamphetamine pipe in a cupholder of the center console. Sergeant Leonard examined the second pipe and noticed that it appeared to be hazier than the other pipe in the ash tray, which

led Sergeant Leonard to believe that the pipe in the center console had been used.

16.  Sergeant Leonard walked back to the rear of the SUBJECT VEHICLE and told Officer Hart about the second methamphetamine pipe.  Officer Hart then performed his own inspection of the passenger compartment of the SUBJECT VEHICLE using his flashlight.  Officer Hart saw a clear pipe that appeared to contain a white hazy residue in the center console cup holder within reach of the driver.  Officer Hart recognized this pipe, based on his training and experience, as a used methamphetamine pipe.  Officer Hart then opened the driver's side door, removed the pipe from the SUBJECT VEHICLE, and physically inspected the pipe.  The pipe contained a white substance in the bottom that Officer Hart recognized as suspected methamphetamine.

**B.   COLLINS Flees the Traffic Stop on Foot**

17.  After Officer Hart removed the suspected methamphetamine pipe from the SUBEJCT VEHICLE, COLLINS looked towards Officer Hart as he was holding the pipe and took off running away from the officers.  PRPD Officers, including Officer Hart, chased COLLINS.  Officers ordered COLLINS to stop running but COLLINS continued to flee.  COLLINS then jumped into a large bush and refused to leave when ordered to do so by officers.

18.  After approximately 20 minutes, COLLINS finally exited the bush and was arrested for delaying or obstructing a peace

8

officer in violation of California Penal Code § 148(a)(1) and possession of drug paraphernalia in violation of California Health and Safety Code § 11364(a).

    **C.    Officers Search the SUBJECT VEHICLE and Find the SUBJECT DEVICE and a Backpack with Methamphetamine, Fentanyl, and a Loaded Ghost Gun Inside**

19.  After COLLINS was arrested, Officer Hart returned to the SUBJECT VEHICLE and began a search.  Officer Hart located the SUBJECT DEVICE on the driver's seat of the SUBJECT VEHICLE.  Officer Hart also found a blue and black Adidas backpack on the floor near the front passenger seat.

20.  Inside the main compartment of the backpack, Officer Hart found a clear plastic Tupperware container.  Inside that container, Officer Hart recovered a substance that DEA laboratory testing later determined to be approximately 111 grams of pure methamphetamine.  Also in the main compartment of the backpack, officers found a Glock-style, semi-automatic 9mm pistol with unknown manufacturer and bearing no serial number (commonly referred to as a "ghost gun") loaded with 8 rounds of 9mm ammunition.

21.  In a separate black bag within the backpack, officers found a blue-and-white container with a substance later determined by DEA laboratory testing to be approximately 8.6 grams of fentanyl.  Officers also found a functional digital scale inside the backpack.

### D. FBI Finds a Rental Agreement in COLLINS's Name for the SUBJECT PREMISES

22. On June 1, 2021, I obtained the evidence seized by the PRPD during COLLINS's arrest and later inspected the contents of the Adidas backpack. Inside the backpack was a cloth label that read, "adidas, property of". On that label, someone had written "Rocc," COLLINS's first name. The backpack also contained mail addressed to COLLINS.

23. Also in the backpack, I located a rental agreement for the SUBJECT PREMISES in COLLINS's name. The rental agreement was signed by a COLLINS on February 20, 2021, and was for unit number B232. I later completed an internet search and learned that the storage company listed on the agreement, Traffic Way Storage, is located at 5395 Traffic Way, Atascadero, California, 93422.

24. On June 10, 2021, I contacted Traffic Way Storage and a representative from that facility confirmed that COLLINS currently rented the SUBJECT PREMISES.

### E. COLLINS's Criminal History

25. I have reviewed COLLINS's certified conviction records and determined that COLLINS has been convicted of at least one of the following crimes punishable by a term of imprisonment exceeding one year:

    a. Possession of a Controlled Substance with Firearm, in violation of California Health and Safety Code Section 11370.1(a), in the Superior Court for the State of

California, County of San Luis Obispo, case number 14C-26787, on or about December 17, 2014;

  b. Obstructing or Resisting Executive Officer, in violation of California Penal Code Section 69, in the Superior Court for the State of California, County of San Luis Obispo, case number 14C-13497, on or about December 17, 2014;

  c. Sale/Transport/Offer to Sell Controlled Substance, in violation of California Health and Safety Code Section 11352(a), in the Superior Court for the State of California, County of San Luis Obispo, case number 17F-05760, on or about October 18, 2017; and

  d. Bringing Controlled Substance into Jail, in violation of California Penal Code Section 4573(a), in the Superior Court for the State of California, County of San Luis Obispo, case number 17F-05760, on or about October 18, 2017.

  **F.** **Interstate Nexus**

26. On or about June 3, 2021, FBI Special Agent Brian J. Sullivan, a certified interstate nexus specialist, examined the eight rounds of ammunition seized from the ghost gun inside COLLINS' truck on May 23, 2021. Agent Sullivan concluded that seven of the rounds of ammunition were manufactured in Italy and the remaining round of ammunition was manufactured in Hungary, Switzerland, Germany, or Tampa, Florida. Agent Sullivan opined that the ammunition necessarily had to have traveled in interstate or foreign commerce in order to reach COLLINS's truck in California.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

27. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

       d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

       e.    Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

28. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

       a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved

in criminal activities for future purchases or referrals. Such information is also often kept on digital devices.

   b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street purchases and sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VII. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[2]

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

---

[2] As used herein, the term "digital device" includes the SUBJECT DEVICE and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    30.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

        b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

        c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress COLLINS's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of COLLINS's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    32.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.     **CONCLUSION**

33. For all of the reasons described above, there is probable cause to believe that COLLINS has committed a violation of 21 U.S.C §§ 841(a)(1) (possession with intent to distribute controlled substance).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT VEHICLE, the person of COLLINS, the SUBJECT PREMISES, and the SUBJECT DEVICE, as described in Attachments A-1, A-2, A-3, and A-4.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 29th day of
June, 2021.


_____
HONORABLE LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE